**Druzella WARFORD**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (State Farm Insurance Companies).**

Civ. No. 94–5080.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Dec. 21, 1994.

Raymond C. Smith, Fayetteville, AR, for plaintiff.

James M. Roy, Roy & Lambert, Springdale, AR, for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This matter is presently before the court for resolution. The parties have stipulated that the court may decide the case on the basis of the materials presented without the need for a trial.

Plaintiff has made demand on State Farm for underinsured motorist coverage in the amount of $50,000 contending that such coverage is implied by law in view of defendant's failure to make such insurance available. Defendant contends that underinsured motorist coverage was made available to the plaintiff and that she rejected the coverage. Alternatively, defendant argues that if coverage is implied such coverage is limited in amount to $25,000.

### Background.

Druzella Warford was involved in a two vehicle automobile accident on April 17, 1992. At the time of the accident she had in full force and effect a policy of insurance issued by the defendant covering a 1988 Honda Accord. The accident was proximately caused by the negligence of the driver of the other vehicle. The limits of the tortfeasor's liability coverage have been exhausted. The parties have stipulated that plaintiff's damages are in excess of the tortfeasor's limits plus the amount claimed against State Farm in this suit. The parties have stipulated that the plaintiff's Arkansas policy did not contain underinsured motorist benefits, referred to as "W Coverage" by State Farm, and no premiums were ever paid for underinsured motorists benefits since plaintiff obtained insurance in Arkansas.

Plaintiff and her husband, Johnny B. Warford [1], moved to the Arkansas from Colorado in late August of 1987. Plaintiff first obtained insurance in Arkansas on September 2, 1987. On September 2, 1987, plaintiff and her husband went to the office of Larry Bittle, an agent for State Farm Mutual Automobile Insurance Company. Plaintiff made application for automobile insurance on a 1976 AMC Hornet. This vehicle had been insured by a State Farm agency in Colorado.

At the same time a sheet of paper entitled "Arkansas Required Automobile Coverages (Acknowledgement of Coverage Rejection)" was filled out. *Stipulated Exhibit* 2. The form contained a box to be checked in the event the insurance applicant declined or rejected underinsured motorist coverage. The following text appeared next to the box dealing with underinsured motorist coverage: "I have been offered Underinsured Motor Vehicle Coverage for bodily injury, with limits up to my automobile bodily injury liability limits, and I reject the coverage entirely." The box was checked indicating the applicant's rejection of underinsured motorist coverage. Plaintiff's signature appears at the bottom of this sheet of paper. No-fault coverage, medical payment coverage, and total disability coverage were also rejected. *Id.*

At the same time Johnny Warford made application for insurance on a 1986 Isuzu. A written rejection form rejecting underinsured motor vehicle coverage was signed and dated by Mr. Warford in connection with that policy. *Stipulated Exhibit* 11. The 1986 Isuzu was sold prior to the date of the accident and the Warfords only had one policy of insurance with State Farm on April 17, 1992.

At the time of the move to Arkansas, the Warfords also owned a 1973 Chevrolet Impala. The Impala was not insured with State Farm because it was not being used by either of the Warfords. On February 11, 1988, the insurance on the 1976 AMC Hornet, policy number 158 6260–E15–04, was transferred to the 1973 Chevrolet Impala. The Hornet was parked and later sold.

Subsequently, the 1973 Chevrolet Impala was traded in on the 1988 Honda. The insurance coverage on the Impala was transferred to the Honda on August 10, 1988, and the insurance coverage changed in certain respects. *Stipulated Exhibit* 5. During this entire period of time none of the Arkansas declaration sheets indicated the Warfords had underinsured motorist coverage. New declaration sheets are issued only when there is a change in coverage, either as to type or amount of coverage, or as to the vehicle being insured. When a change is made on

---

1. Druzella and Johnny Warford are now divorced.

the declaration sheet, a copy of the sheet is mailed to the insured. A new policy is not mailed to the insured along with the declaration sheet unless there has been a change in an endorsement or a change in the policy booklet.

The parties have submitted to the court a number of exhibits including the depositions of Druzella and Johnny Warford. The parties have stipulated that the testimony of Larry Bittle would be as follows:

> Larry Bittle would testify that he is an agent of State Farm Mutual Automobile Insurance Company and was an agent of the company in September 1987. On September 2, 1987, Druzella Warford and Johnny Warford came to his office. They advised him they wished to insure two vehicles, a 1986 Isuzu pickup and a 1976 AMC Hornet. The application for the Isuzu was filled out first. The application for the 1976 AMC Hornet was then filled out, and that is why it has written on it, "See App. 1", referring to the Isuzu application which had already been filled out. Bittle went over with the Warfords the coverages that could be accepted or rejected. Based on the conversation with the Warfords, Bittle checked the boxes on Exhibit 2, the rejection form on the 1976 AMC Hornet, and Druzella Warford signed at the bottom rejecting underinsured motorist coverage and the no-fault coverage. On the rejection form on the Isuzu, Exhibit 11, Larry Bittle made the checkmark rejecting underinsured motorist coverage and Johnny Warford signed Exhibit 11.

Johnny Warford does not recall anything about the filing out of the rejection sheet. *Johnny Warford Deposition* at 27–28. Mr. Warford does, however, remember requesting "full coverage." *Id.* at 35. Druzella Warford testified that her signature appears on the rejection sheet filled out in connection with the 1976 Hornet. *Druzella Warford Deposition* at 58. She could not recall reading the rejection sheet, checking the boxes, or having underinsured motorist coverage explained to her. *Id.* at 58–59. Plaintiff also remembers requesting "full coverage."

Plaintiff's primary contention is quite simply that State Farm had an obligation under Arkansas law to affirmatively offer her underinsured motorist coverage when insurance coverage was placed on a substituted vehicle. In plaintiff's view the substitution of coverage constitutes new insurance under Arkansas case law. Since State Farm failed to offer the underinsured motorist coverage at the time of substitution and she did not reject it in writing, plaintiff contends coverage in the amount of $50,000 is implied by operation of law. Plaintiff relies primarily on *American Nat'l Property & Casualty Company v. Ellis*, 315 Ark. 524, 868 S.W.2d 469 (1994) and the earlier decision it followed, *Lucky v. Equity Mutual Ins. Co.*, 259 Ark. 846, 537 S.W.2d 160 (1976).

Plaintiff next argues that there was no notice given to her regarding underinsured motorist coverage nor was she required to reject such coverage in writing after the effective date of the 1991 amendments to the underinsured motorist statute. Finally, plaintiff argues the language on the rejection sheet is ambiguous and misleading. Thus, even assuming she read the page before she signed it, plaintiff argues it is unlikely that an applicant or insured could make an informed decision on whether to accept or reject coverage.

***Discussion.***

The underinsured motorist statute as originally codified provided as follows:

> (a) Every insurer writing automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicles in this state shall make underinsured motorist coverage available to the named insured, which coverage enables the insured or the insured's legal representative to recover from the insurer the amount of the damages for bodily injury or death to which the insured is legally entitled from the owner or operator of another motor vehicle. Coverage limits shall be equal to the limits of liability provided by the underinsured motorist coverage to the extent the coverage exceeds the limits of the bodily injury cover-

age carried by the owner or operator of the other motor vehicle.

Ark.Code Ann. § 23–89–209 (1987).

The first interpretation of this statute appears to have occurred in a case arising out of this court, *Edens v. Shelter Mut. Ins. Co.,* 923 F.2d 79 (8th Cir.1991). This court and subsequently the Eighth Circuit in affirming our ruling held that "an insurer doing business in Arkansas complies with § 23–89–209 when it gives the named insured the opportunity to purchase underinsured motorist coverage by conspicuously including an option for such coverage on the face of the standard policy application, renewal notice, or change-in-coverage insurance forms sent to policyholders." *Id.* at 82.

In so ruling, it was noted that the Arkansas no-fault and uninsured motorist statutory schemes required opt-out provisions. In contrast the underinsured motorist provisions did not require an insured to reject such coverage. The Eighth Circuit noted "[t]his difference in language likely demonstrates the Arkansas legislature's policy decision that uninsured and no-fault insurance are so vital that they will be assumed to be part of a policy unless rejected, while underinsured motorist coverage is less vital and must merely be available for election by an insured." *Id.* at 81.

The underinsured motorist statute was amended by Acts 209 and 1123 of 1991, 1991 Ark.Acts 209 & 1123, now codified at Ark. Code Ann. § 23–89–209 (Repl.1992), to provide that "like in no-fault and uninsured coverage situations, insurers shall provide underinsured motorist coverage to the named insured unless such coverage is rejected in writing by the insured." *Shelter Mutual Ins. Co. v. Irvin,* 309 Ark. 331, 334, 831 S.W.2d 135 (1992). The 1991 amendments provide:

(a) Every insurer writing automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicles in this state shall provide underinsured motorist coverage unless rejected in writing by a named insured. The notice to policyholders regarding the right to reject the coverage required in this section applies to policies issued after February 21, 1991, or the first renewal after February 21, 1991, of an existing policy unless the coverage has been rejected in writing prior to February 21, 1991, by a named insured of an existing policy. After a named insured or applicant for insurance rejects underinsured motorist coverage, the insurer or any of its affiliates shall not be required to notify any insured in any renewal, reinstatement, substitute, amended or replacement policy as to the availability of such coverage. . . .

Ark.Code Ann. § 23–89–209 (Repl.1992). Section 5 of Act 209 provided:

It is hereby found and determined by the General Assembly that the present underinsured motorist insurance coverage law is being misinterpreted; that under the present misinterpretation persons covered by underinsured motorist coverage may not receive the benefits intended by the law; and that this act clarifies the law and should therefore go into effect immediately in order to resolve the misinterpretation as soon as possible. Therefore an emergency is hereby declared to exist and this act being necessary for the preservation of the public peace, health and safety shall be in full force an effect from and after its passage and approval.

In 1993 the underinsured motorist statute was once again amended by Act 1180. 1993 Ark.Acts 1180. With regard to the rejection of coverage the statute now provides "[a]fter a named insured or applicant for insurance rejects *underinsured motorist coverage,* the insurer or any of its affiliates shall not be required to notify any insured in any renewal, reinstatement, substitute, amended, or replacement policy as to the availability of such coverage." Ark.Code Ann. § 23–89–209 (Supp.1993).

In this instance the 1987 version of the statute was in effect when the Warfords first obtained insurance in Arkansas. The 1991 version and the requirements thereof became effective several years after the 1988 Honda had been substituted. It is State Farm's position that they were not required to obtain a second rejection because the coverage

had already been rejected in writing prior to February 21, 1991.

The case on which plaintiff primarily relies is *American Nat'l Property & Casualty Company v. Ellis*, 315 Ark. 524, 868 S.W.2d 469 (1994). The *American National* case in turn relied primarily on the case of *Lucky v. Equity Mutual Ins. Co.*, 259 Ark. 846, 537 S.W.2d 160 (1976). In *American National*, a case involving uninsured motorist coverage, the Arkansas Supreme Court summarized their holding in *Lucky* as follows:

> In *Lucky* ... we held that when the parties to an insurance contract agree to a policy endorsement which has the effect of substituting coverage of one automobile for that of another the transaction constitutes new insurance, "delivered or issued for delivery in this State." The effect of the decision was to require insurers, pursuant to a statute now codified as Ark.Code Ann. § 23–89–403(a) (Repl.1992), to offer uninsured motorist coverage to the insured upon the event of substituting vehicles even though the insured had previously rejected such coverage.

*American National*, 315 Ark. at 524, 868 S.W.2d 469.

Between the decision rendered in *Lucky* and the decision in *American National* the uninsured motorist statute had been amended. During the legislative session following the decision in *Lucky* the words "and this rejection shall continue until withdrawn in writing by the insured" were added. *American National*, 315 Ark. at 525, 868 S.W.2d 469. In *American National* the court was asked to determine whether the addition of those words changed the law as set forth in *Lucky*. The court held that it did not. *American National*, 315 Ark. at 525, 868 S.W.2d 469.

The court rejected the argument made by American National that the amendment effectively overruled *Lucky*. The court stated:

> Our decision in the *Lucky* case was that the substitution of a vehicle constituted issuance of or the delivery of an insurance policy. As the Chancellor put it, although he did not rely on the *Lucky* decision, a new contract is entered when a new declaration occurs with respect to a substituted vehicle. If the General Assembly intended to, in effect, overrule that decision, it failed to do so because it said nothing which affects the holding of the case. We are certain the General Assembly did not intend that rejection of uninsured motorist coverage in one insurance contract be binding in a subsequent one.

*American National*, 315 Ark. at 526, 868 S.W.2d 469.

State Farm argues *American National* is distinguishable. Most importantly, State Farm emphasizes the fact that *American National* dealt with the **uni**nsured motorist statute not the **under**insured motorists statute. It is pointed out that the language in the underinsured motorist statute regarding the continuing effectiveness of a rejection in writing is much different from that used in the uninsured motorist statute and the no-fault statute.

State Farm points out that the language of the 1991 version of the underinsured motorist statute having to do with the effectiveness of a rejection is much broader than the language used in the uninsured and no-fault statutes. The 1991 version of the underinsured motorist statute, as quoted above, requires no new rejection as to (1) any renewal, (2) reinstatement, (3) substitute, (4) amended policy, or (5) replacement policy. It is contended that the substitution of first the 1973 Impala and then the 1988 Honda for the 1976 Hornet constitutes either a "substitute," "replacement," or "amended policy," within the meaning of the statute and required no new written rejection.

In view of this, State Farm contends the rejection signed by the Warfords as to both vehicles insured when they moved to Arkansas constituted an effective rejection and there was no need on the part of State Farm to ever secure another written rejection. We are reminded that all of the declaration sheets clearly reflect that there was no underinsured motorist coverage.

The Arkansas Supreme Court has on a number of occasions, in construing the underinsured motorist provision, looked to changes in the statute made by subsequent amendments to guide in the interpretation of

legislative enactments. For instance, in the case of *Birchfield v. Nationwide Ins.*, 317 Ark. 38, 875 S.W.2d 502 (1994) the court looked to the 1993 amendments of the act to discern the legislative intent with respect to language regarding the limits of liability coverage. The court stated "[w]ith respect to Act 1180 of 1993, we are mindful that the accident in this case occurred in 1989. But we have looked to subsequent legislation in the underinsured motorist area to guide us in our interpretation of legislative enactments. We choose to do so again in this case, and look to the expression of legislative intent as set out in Act 1180." *Id.*, 317 Ark. at 42, 875 S.W.2d 502 (citations omitted). *See also American Casualty Co. v. Mason*, 312 Ark. 166, 848 S.W.2d 392 (1993); *Nixon v. H & C Elec. Co.*, 307 Ark. 154, 818 S.W.2d 251 (1991).

The first opportunity the Arkansas Supreme Court had to construe the underinsured motorist statute came in *Shelter Mutual Ins. Co. v. Irvin*, 309 Ark. 331, 831 S.W.2d 135 (1992). The court was asked to construe the 1987 version of the statute in deciding whether Shelter had complied with the "shall make available" requirement by providing the named insureds with insurance application forms containing a box which they could check if they wanted underinsured motorist coverage and by filing rates and endorsements for such coverage with the Arkansas Insurance Commissioner.

The Arkansas Supreme Court disagreed with the *Edens* decision. *Edens v. Shelter Mut. Ins. Co.*, 923 F.2d 79 (8th Cir.1991). The court looked to the 1991 amendment of the statute to aid in its interpretation. The court noted that the 1991 amendments dispelled any notion that the General Assembly "considered uninsured [underinsured] coverage less vital than no-fault or uninsured coverages." *Shelter*, 309 Ark. at 334, 831 S.W.2d 135. The court held that the insurer failed to offer the underinsured coverage when it failed to give oral notice of the coverage and never sent or conveyed any written information about the coverage to its insureds. The court implied coverage by operation of law. *Shelter*, 309 Ark. at 335, 831 S.W.2d 135. *See also Shelter Mut. Ins.*

*Co. v. Bough*, 310 Ark. 21, 834 S.W.2d 637 (1992).

■ The gist of plaintiff's argument is that when State Farm substituted any vehicle for the originally insured vehicle, the 1976 AMC Hornet, the substitution constituted "new insurance" and State Farm was required to offer or make available underinsured motorist coverage. As we noted above, the substitution of the Impala occurred in February of 1988 and the substitution of the Honda occurred in August of 1988.

The 1987 version of the statute was in effect at the time the Warfords first obtained insurance in Arkansas and at the time of the substitution of both vehicles. This version required every automobile liability insurer to "make underinsured motorist coverage available to the named insured...." Ark.Code Ann. § 23–89–209 (1987). No written rejection was required and the statute made no reference to the continuing effectiveness of a rejection once made.

■ State Farm, apparently in an abundance of caution, required a written rejection of the underinsured motorist coverage. This rejection was obtained from plaintiff. Plaintiff admits it is her signature on the rejection form but states she has no recollection of whether or not the form was filled out when she signed it and does not remember reading it. To the extent plaintiff attempts to argue she is not bound by her signature on the rejection form, we reject her contention. It is a well settled rule of law that in the absence of fraud a party is bound by her signature on a contract whether or not she read what she signed. *See e.g., Universal C.I.T. Credit Corp. v. Lackey*, 228 Ark. 101, 305 S.W.2d 858 (1957).

Plaintiff also argues the written rejection form was misleading and ambiguous. In particular, she argues paragraph three dealing with underinsured motorist coverage does not clearly inform the applicant that underinsured motorist coverage would enable the insured to recover from their own insurer. Plaintiff then argues "[a]ssuming the insured read this page before signing without any explanation by the insurer, it is unlikely that an applicant or insured could make an

informed decision on whether to accept or reject the coverage."

The form in question contains three explanatory paragraphs. The third paragraph references underinsured motorist coverage and provides as follows:

> In addition to the above coverages, Arkansas law requires that insurers make available underinsured motor vehicle coverage. If you are legally entitled to collect damages for bodily injury or death from the owner or operator of another motor vehicle which is insured for bodily injury and those limits are insufficient to pay these damages, you may recover up to the difference between your damages and the amount received from the owner or operator of the at-fault motor vehicle. In no event may you recover more than the limits of liability.

*Stipulated Exhibit 2.*

The court does not believe the form is ambiguous or misleading. Nor is there any evidence that the plaintiff was in fact mislead by the information contained thereon. Instead, plaintiff merely states she has no recollection of the form but admits it is her signature on the bottom.

The language of the uninsured motorist statute construed in *Lucky* and *American National* differs significantly from that contained in the underinsured motorist statute. The uninsured motorist statute provided that "[n]o automobile liability insurance ... shall be delivered or issued for delivery in this State ... unless" it contains the minimum statutory amount of uninsured motorist coverage "provided, however, that the coverage required under this section shall not be applicable where any insured named in the policy shall reject the coverage." *Lucky,* 259 Ark. at 847–48, 537 S.W.2d 160. Based on its interpretation of this language, the court in *Lucky* held that a non-premium endorsement substituting vehicles under an existing policy provided insurance coverage not previously existing on the vehicle. The court stated:

> Our interpretation of the uninsured motorist statute here follows the statutory construction rule that where the enacting clause of a statute is general in its language and purpose, a proviso subsequently following should be construed strictly so as to exempt no cases from the enacting clause which do not fairly fall within its terms. To accept the construction which appellee would have us place on the uninsured motorist statute would permit one rejection to be effective for any and every automobile that might be substituted by the insured for the original vehicle. Such a construction should not be placed upon a public policy statute that expects uninsured motorist coverage to be issued or rejected any time automobile liability insurance is "delivered or issued for delivery in this State."

*Lucky,* 259 Ark. at 848, 537 S.W.2d 160 (citation omitted).

The underinsured motorist statute, of course, does not contain the language on which the *Lucky* decision turned. We therefore do not believe the Arkansas Supreme Court would apply the holding of *Lucky* and *American National* to either the 1987 or 1991 versions of the underinsured motorist statute.

Additionally, in the underinsured motorist context the Arkansas Supreme Court has consistently looked to the language of subsequent enactments. These subsequent changes in language have been used in interpreting prior versions of the underinsured motorist statute. We have no reason to believe the Arkansas Supreme Court would alter the course it has taken. Thus, we believe it is appropriate to consider the language of the subsequent amendments.

The 1991 amendments, quoted above, required a rejection in writing by a named insured. Ark.Code Ann. § 23–89–209 (Repl. 1992). This right to reject applied to "policies issued after February 21, 1991, or the first renewal after February 21, 1991, of an existing policy unless the coverage has been rejected in writing prior to February 21, 1991, by a named insured of an existing policy." *Id.* The amendment further provided that "[a]fter a named insured or applicant for insurance rejects underinsured motorist coverage, the insurer or any of its affiliates shall not be required to notify any insured in any renewal, reinstatement, sub-

stitute, amended or replacement policy as to the availability of such coverage." *Id.* Thus, the language of the 1991 amendments further support our conclusion that the substitution of a vehicle under an existing policy does not require the insurer to obtain another rejection of the coverage.

Further, we do not believe the 1991 amendments required State Farm to obtain a new written rejection form on the first renewal date after February 21, 1991. By its terms this was not required if the coverage had been rejected in writing prior to that date on an existing policy.

The 1993 version provides no insurance "shall be delivered or issued in this state ... unless the insured has the opportunity, which he may reject in writing, to purchase underinsured motorist coverage." Ark.Code Ann. § 23–89–209(a) (Supp.1993). The 1993 amendments retain the identical provision as the 1991 version regarding the continuing effectiveness of a rejection.

We believe the holding on *Lucky* and *American National* do not extend to the underinsured motorist statute. Accordingly, we hold the rejection of underinsured motorist coverage obtained from the plaintiff in 1987 was effective and that a second or subsequent rejection was not required by the 1991 amendments nor was one required when a vehicle was substituted for the original vehicle.

*Conclusion.*

For the reasons stated herein, we conclude no underinsured motorist coverage is implied by operation of the law with respect to the plaintiff's policy of insurance. A separate judgment in accordance herewith will be concurrently entered.